**FILED**

MAR 07 2011

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH COMER-BECKETT (as assignee of Richard and Gail Martin and in her own right), RICHARD MARTIN, and GAIL MARTIN, | ) ) ) ) ) ) | CASE NUMBER:   11-*5017* |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **COMPLAINT** |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | ) ) ) ) | |
| Defendant. | ) ) | |

COME NOW Plaintiffs, Elizabeth Comer-Beckett, Richard Martin, and Gail

Martin, and for their Complaint assert and allege as follows:

### INTRODUCTION

This action arises out of the handling of a personal injury claim and subsequent

legal action brought by Elizabeth Comer-Beckett (Beckett) against Richard and Gail

Martin (the Martins). Beckett's personal injury claim stemmed from an August 27, 2004,

automobile accident on Highway 14 in Stanley County, South Dakota, that occurred

when Richard Martin, driving a 1999 Dodge Ram with a 26-foot horse trailer, struck

Elizabeth Comer-Beckett's vehicle from the rear.

At the time of the accident, Richard and Gail Martin were covered by a $100,000

policy limit automobile liability policy issued by State Farm Mutual Automobile

1

Insurance Company (State Farm). The Martins also held other State Farm automobile liability policies that were potentially applicable to the accident.

Beckett retained attorney Mark A. Koehn (Koehn) of Rapid City, South Dakota, to represent her in connection with her personal injury claim against Richard Martin. On or about May 24, 2005, Koehn filed a personal injury civil suit on behalf of Beckett. State Farm appointed Rapid City, South Dakota, attorney Courtney Clayborne (Clayborne) to handle the defense of Richard Martin in the personal injury action. Later, one of Clayborne's partners, Gregory Strommen (Strommen), became the primary handling attorney in the defense of Richard Martin.

Plaintiffs allege that State Farm engaged in numerous instances of misconduct in its handling of the claims stemming from the August 27, 2004, motor vehicle accident and in its defense of the Martins; and that such misconduct was motivated by State Farm's practice of acting to further its own business interests, even at the expense of its own insureds and those individuals asserting valid claims against State Farm insureds under State Farm issued insurance policies.

State Farm's misconduct was intended to further its own business interests by intimidating Beckett into either dropping her claim against State Farm's insured or settling what was clearly a policy limits claim for less than State Farm's policy limits. State Farm has also attempted to conceal from its insured, Richard Martin, the fact that its misconduct exposed the Martins to an excess liability judgment. As a further consequence of State Farm's misconduct, Beckett continues to be unable to obtain regular medical treatment of her injuries.

State Farm's misconduct includes but is not limited to the following specific actions and omissions:

- Concealing possibly applicable insurance policies;
- Failing to conduct a timely investigation of the facts relating to liability and damages;
- Refusing to admit liability, despite the fact that Richard Martin rear-ended Beckett's vehicle (without legal excuse), was cited for following too closely, and pled guilty to the charge;
- Using a frivolous liability defense to mislead the Martins as to the likely outcome at trial of the personal injury action;
- Refusing Beckett's offers to settle for the State Farm policy limits ($100,000), which refusals dated from May 2005, when Beckett's medical expenses were already in excess of $60,000, and continued through March 30, 2006, when Beckett's medical expenses were far in excess of $100,000 and the only thing keeping those expenses from being still higher was the fact that Beckett's medical treatment privileges had been terminated due to her inability to stay current on her treatment bills;
- Refusing to make a single offer of settlement until more than six months *after* Beckett's treatment privileges had been terminated, despite the fact that Beckett's attorney had repeatedly warned over a four month period that Beckett would withdraw her long-standing offer to settle for State Farm's policy limits if Beckett were to lose her treatment privileges; and
- Failing to inform the Martins of settlement offers, and the circumstances and conditions surrounding those offers.

In April 2008, at trial of the personal injury action brought by Beckett against Richard Martin, the jury returned a verdict of $150,000, an amount well in excess of the Martins' $100,000 in available insurance coverage. Despite the fact that State Farm repeatedly refused to settle Beckett's claim against the Martins for the limits of the Martins' State Farm liability policy, the company continues to refuse to pay the $50,000 excess judgment now faced by its insureds.

The personal injury judgment was the direct result of State Farm's various violations of its applicable legal duties to the Martins, and would not have occurred had State Farm not consistently and repeatedly placed its own interests ahead of those of its

insureds. In the end, the Martins are now personally liable for a $50,000 excess judgment and Beckett remains without the money necessary to obtain medical care, all as a result of State Farm's fraudulent and illegal activities.

*       *       *

The activities engaged in by State Farm (many of which were undertaken though its agents, Clayborne and Strommen) are consistent with State Farm's behavior in numerous other instances. Such other instances of similar behavior have been demonstrated by plaintiffs and other interested individuals in numerous other courts and in a number of other jurisdictions. Evidence of such other instances is typically admissible under Rule 404(b) to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident", and, in this case will establish that State Farm's wrongdoing is institutionalized, ongoing, and, in the absence of legal penalties, likely to continue into the foreseeable future.

Bad faith insurance laws were put in place to prevent the misuse of the power to take unfair advantage that is inherent in the relationship between an insurer and its insured, the wrongful exercise of which power is evident in the context of this action. As is set forth in detail below, State Farm violated its duties to its insureds intentionally, repeatedly, and pursuant to schemes of wrongdoing that are ongoing.

## JURISDICTION, VENUE, AND PARTIES

1.      The automobile accident that gave rise to the underlying insurance claim and personal injury litigation in this matter occurred in South Dakota. The individual who made the claim (Beckett) is a resident of South Dakota. The attorneys she hired to make her claim against State Farm's insured, Richard Martin, work out of Rapid City, South

Dakota, as do the attorneys hired by State Farm to defend its insured. The personal injury litigation in which State Farm appointed defense counsel to defend its insured occurred in South Dakota. South Dakota, thus, has subject matter jurisdiction over this matter and personal jurisdiction over each and every party to this action.

2.      Plaintiff Elizabeth Comer-Beckett is a resident of Rapid City, Pennington County, South Dakota. She is a judgment creditor of State Farm policy holder Richard Martin for damages caused by an August 27, 2004, automobile accident. She has also been assigned rights, as described in Paragraph 3, below, by Richard and Gail Martin that they have against State Farm and its agents. She also has independent standing to pursue causes of action against State Farm for independent acts of misconduct toward her.

3.      Plaintiffs Richard Martin and Gail Martin are a married couple, residing in the State of Minnesota. They have claims against State Farm stemming from State Farm's acts and omissions in the handling of the personal injury claim brought against Richard Martin by Elizabeth Comer-Beckett. To the extent allowed by law, the Martins have fully assigned their claims against State Farm and its agents to Elizabeth Comer-Beckett, with the exception of their claims for non-economic losses, which claims they have specifically retained. To the extent that it is found that the Martins do not have the legal right to assign any claim or claims they have attempted to assign to Elizabeth Comer-Beckett, the Martins explicitly retain such claim or claims and assert it herein in their own right.

4.      Defendant State Farm Mutual Automobile Insurance Company is an Illinois corporation headquartered in Bloomington, Illinois, in good standing with the State of South Dakota, and licensed to transact business in the State of South Dakota. On

information and belief, State Farm is the parent company for other subsidiary insurance companies doing business within the State of South Dakota. At all times relevant to the allegations contained in this complaint, attorneys Clayborne and Strommen, who are not named as defendants herein, were acting as agents of State Farm.

5.     There is, thus, complete diversity among the indispensable parties to this action, and this Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

### I.     The Accident, the Policies, and the Personal Injury Claim

6.     On August 27, 2004, Richard and Gail Martin owned several automobiles, with a different State Farm Mutual Automobile Insurance Company (State Farm) automobile insurance policy on each. The policy written on the 1999 Dodge Ram Richard Martin was driving at the time of the accident had a $100,000 policy limit.

7.     On August 27, 2004, while returning home to Minnesota from a trip to South Dakota, Richard Martin rear-ended a vehicle driven by Elizabeth Comer-Beckett (Beckett). Richard Martin was cited at the scene for following too closely, to which charge Richard Martin subsequently pleaded guilty.

8.     At the time of the accident, Richard Martin was pulling a 26-foot horse trailer containing two riding horses.

9.     As a result of the accident, Beckett received injuries to her neck and back. Shortly thereafter, Beckett was treated in a Pierre, South Dakota, emergency room. When she returned to her home in Rapid City, she was immediately seen by a chiropractor.

10.     After several months of conservative chiropractic care, Beckett was referred to a pain management specialist, Dr. Steven Frost, who began treating her with injections that provided limited relief.

11.     By March 25, 2005, Beckett had been referred by Dr. Stephen Frost to a rhizotomy treatment specialist, Dr. William Cohen of the American Pain Relief Institute (APRI), in Yankton, South Dakota.

12.     On April 11-13, 2005, Beckett received her first series of rhizotomy treatments from Dr. Cohen. The total charge for this cervical rhizotomy treatment procedure was more than $23,000, bringing Beckett's total medical expenses to that date to approximately $30,000.

13.     On April 26, 2005, Beckett attorney Mark Koehn updated State Farm regarding Beckett's April 11-13, 2005 rhizotomy treatments and her scheduled May 2005 treatments. In the course of that letter, he stated:

> [W]ith medical expenses on this claim which will exceed $30,000 by the end of May and lost wages which are continuing to mount, I believe Liz is already entitled to your insured's full policy limits.

14.     On May 16-18, 2005, Beckett received her second series of rhizotomy treatments from Dr. Cohen. The total charge for this lumbar rhizotomy treatment procedure was more than $29,000, bringing Beckett's total medical expenses to that date to approximately $60,000.

## II.     The Personal Injury Action – Early Stages

15.     On May 24, 2005, a previous $100,000 policy limit offer of settlement having not been accepted, Koehn filed suit on behalf of Beckett against Richard Martin.

On this same date, Koehn served written discovery requests seeking information regarding other policies that might provide coverage for Beckett's claim.

16.     Attorney Clayborne was selected by State Farm to handle Richard Martin's defense. In a June 13, 2005, letter to Richard Martin, Clayborne advised Richard Martin that he should "always remember that I am hired to protect your interest and not those of State Farm Insurance Company." Clayborne filed Richard Martin's Answer to Beckett's Complaint on June 15, 2005.

17.     In his July 20, 2005, responses to Beckett's written discovery requests, Clayborne disclosed no insurance policies other than the State Farm policy on the 1999 Dodge Ram Richard Martin was driving at the time of the accident.

18.     By letter of July 22, 2005, attaching an asset search report, Koehn requested that Clayborne informally supplement his discovery responses to provide information regarding additional policies.

19.     Koehn attached an updated version of a March 7, 2005, settlement brochure he had sent to State Farm prior to filing suit, which updated brochure stated in part, that "[t]hrough June 27, 2005, Liz's medical expenses totaled $68,961.09."

20.     On August 15, 2005, having received no response whatsoever to his request for an informal identification and production of possibly applicable additional insurance policies, Koehn wrote to Clayborne, indicating that he would be serving a second set of written discovery requests for the purpose of identifying and obtaining additional possibly applicable insurance policies. Koehn also again reminded Clayborne of Beckett's rapidly mounting medical expenses:

> As Liz's records indicate, rhizotomy treatments run somewhere between $25,000 and $50,000 per treatment sequence, and the average rhizotomy patient requires

treatments every six months to 2 years. The only policy of insurance so far disclosed will cover only a small portion of Liz Beckett's damages. In fact, a single additional treatment sequence could push her past medical expenses alone close to the limits (plus PIP benefits) of the State Farm policy.

21.     On August 23, 2005, Koehn served Beckett's Second Request for Production, again seeking disclosure of all potentially applicable insurance policies. Another copy of the Richard Martin asset search report was attached to the request, which report identified specific vehicle identification numbers (VIN's) for other vehicles owned by Richard Martin.

22.     On September 30, 2005, with Beckett's medical expenses mounting, Koehn wrote Clayborne requesting that Clayborne move to set dates for the depositions of Beckett and her care providers, which depositions Clayborne had previously indicated he would need to take prior to making any offer of settlement.

23.     On October 10-12, 2005, Beckett underwent her third series of rhizotomy treatments. The charges for this combined cervical/lumbar series totaled almost $40,000, bringing Beckett's medical expenses to that date near or in excess of the State Farm policy limits of $100,000.

24.     Following the November 9, 2005, depositions of Beckett and her husband, Jess Beckett, Clayborne indicated he would request an Independent Medical Examination.

25.     In his November 17, 2005, response to Beckett's August 23, 2005, requests for production, Clayborne did not provide the requested insurance information regarding policies written on the Martins' other vehicles. Instead, he provided misleading information consisting of what appear to be direct quotes from his client, "This is my daughter's vehicle and I do not carry insurance on it" and "I no longer own this vehicle".

Neither Clayborne nor anyone from his office ever spoke with the Martins about the possible relevance of additional insurance policies or of the possible benefits to them of disclosing such additional insurance policies. (It was later determined that all of the Martins' vehicles were covered by separate State Farm policies.)

### III.   Beckett's Offers of Settlement, Defense Counsel's Refusal to Communicate, and Insurers' Failure to Respond to Offers

26.     By letter of November 26, 2005, addressed to Clayborne, Koehn proposed a version of a 'Miller-Shugart' agreement, under which Beckett would agree to limit her total recovery to the limits set by available insurance coverage (i.e., either the $100,000 representing the State Farm policy limits or up to $400,000, representing the State Farm policy limits *plus* as much as a RAM Mutual homeowners' policy's $300,000 limits, depending on the outcome of any coverage and factual defenses raised by RAM Mutual), while continuing to allow RAM Mutual to raise all available factual and coverage defenses, in exchange for State Farm's tender of its $100,000 policy limits. In that letter, Koehn also set forth his concerns about Beckett's potential loss of treatment privileges as a result of State Farm's ongoing delays in its handling of Beckett's claim.

27.     If Clayborne was unsure as to the full implications of a 'Miller-Shugart' agreement, minimal legal research on his part would have revealed that (i) such an agreement would not have effected a waiver of any coverage defenses RAM Mutual might have had, and (ii) even as to the substance of the claim, the stipulated judgment would not have been binding on RAM Mutual were it not given notice and a fair opportunity to contest the claim:

> Under *Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982), an insured defendant may stipulate for settlement of a plaintiff's claims and stipulate judgment may be collected only from the proceeds of any insurance policy, with no personal

liability to the defendant. The stipulated judgment is not conclusive on the insurer. The plaintiff judgment creditor must show the settlement was reasonable and prudent.

*Medd v. Fonder*, 543 N.W.2d 483, 485 (N.D. 1996).

28.     In a November 29, 2005, letter to State Farm adjuster, Dawn Truax (Truax), Clayborne summarized Beckett's settlement offer as follows: "Plaintiffs are indicating they would like to enter into settlement negotiations with Mr. Martin and ultimately have him exhaust his policy limits with State Farm and enter into a subsequent agreement to be released personally in exchange for signing such an agreement."

29.     Although noting that "this idea has some merit", Clayborne went on to state in his letter that "it has two flaws which I see. First, I do not believe that Mr. Martin was engaged in any type of business activity at the time of the accident. . . . [H]owever, I have not had opportunity to fully discuss the trip with Mr. Martin to see if any component of this trip had a business purpose, i.e., buying livestock, looking at additional farming land, etc. . . . ***The next problem would be that this matter would require that State Farm tender their policy limits towards settlement.***"  (Emphasis added)

30.     By e-mail of December 2, 2005, Koehn again noted Beckett's growing medical expenses ("with $110,000 in past medicals") and explicitly stated Beckett's continuing willingness to settle "for the possibility of $400,000. That is, if there appears to be a factual basis for claiming coverage under the RAM Mutual policy, my client is willing to settle for the State Farm policy limits and a confession of judgment with an agreement by my client not to seek recovery beyond the available insurance."

31.     In a December 6, 2005, e-mail Clayborne rejected Beckett's offer of settlement, and rejected as well Koehn's contention that there might be coverage under

11

the RAM Mutual policy ("he was just on vacation at the time of the injury so there would not be coverage").

32.     Despite claiming that there were issues regarding preexisting conditions that could only be resolved by an IME, Clayborne made no mention in his letter as to when such an IME might take place.

33.     Despite having based their rejection of Beckett's policy limits offer on their contention that Beckett's mounting medical expenses might not be causally related to the August 27, 2004, accident, neither Clayborne (or, later, Gregory Strommen) nor any other representative or agent of State Farm took any steps to investigate whether Beckett's injuries were causally related to the August 27, 2004, accident until after Beckett had terminated her offer of settlement almost **four (4)** months later, on March 30, 2006.

34.     By e-mail of December 8, 2005, to Clayborne, Koehn (i) reiterated Beckett's offer to settle; (ii) explained that such offer was, if there in fact turned out to be no coverage under the RAM Mutual policy, an offer to settle for the $100,000 State Farm policy limits; (iii) reminded Clayborne, again, that the point would soon be reached "where even a policy limits recovery leaves Liz with medical bills owing and the likelihood of being cut off from further medical treatment"; (iv) reminded Clayborne that the settlement offer would remain open until December 12, 2005; and, (v) indicated that he looked forward to continuing discussion of Beckett's claim after the IME.

35.     By letter of January 12, 2006, pain management care provider West River Anesthesiology Consultants placed Beckett on notice that she would no longer be allowed to receive treatments until her account was brought current.

36.     By letter of January 17, 2006, having received no communication from

Clayborne since Clayborne's December 6, 2005, e-mail, Koehn extended Beckett's

'Miller-Shugart' offer until March 1, 2006:

> I believe you have now received all the documents covered by the informal
> requests you made at my clients' depositions. Please let me know if and when you
> intend to schedule Ms. Beckett's Independent Medical Examination. . . . I would
> also like to extend my client's previous offer of settlement until March 1, 2006, or
> until such earlier time as my client instructs me to revoke the offer. . . . As you
> recall, I had previously proposed a $400,000 "Miller-Shugart" arrangement,
> pursuant to which your client would concede liability up to $400,000, while my
> client would agree to limit her recovery to insurance monies. Given your earlier
> statement that your client's South Dakota trip was not in any way business
> related, my client's previous offer was effectively an offer to settle for the
> applicable limit of the State Farm policy. . . . That is the offer I am now
> extending. . . . As I have indicated previously, I am of the opinion that there is no
> reasonable basis for State Farm's failure to tender its policy limits. Nor, in light of
> your client's exposure to the possibility of a devastating excess judgment, has
> there been any reasonable or good faith basis for a failure to tender from the point
> in July when you received my client's settlement binder, documenting
> approximately $68,000 in medical expenses to [that] date and ongoing debilitating
> headaches clearly linked to the accident with your client. Subsequent to the
> October rhizotomy treatments, which pushed Liz's medical expenses to [that] date
> over $110,000, State Farm's failure to tender policy limits becomes even more
> arbitrary. . . . It is my client's hope that by continuing to hold open what amounts
> (for State Farm's purposes at least) to a simple policy limits demand we can
> hasten whatever remaining steps you, your clients, or their insurers believe to be
> necessary to complete evaluation of my clients' claim and injuries. I am hopeful
> that nearly a full additional month will be adequate for the completion and
> evaluation of an IME. I can certainly see no reason at this point why it would not.

37.     As of March 1, 2006, the stated termination date of Beckett's policy limits

settlement offer, Koehn had received no further communication from Clayborne.

38.     On March 23, 2006, Beckett's treatment privileges with her rhizotomy

care-providers, APRI and Dr. William Cohen, were terminated due to her large unpaid

balance.

39.     At no time prior to the March 30, 2006, termination of Beckett's policy

limits offer of settlement, did either Clayborne or Gregory Strommen ever clearly inform

the Martins that an offer of a policy limits settlement had been made on November 29,
2005. Nor were any of Beckett's offers made between November 29, 2005, and March
30, 2006, ever communicated to the Martins. The closest the Martins' attorneys ever
came to communicating **any** of Beckett's offers of settlement to their clients was
Clayborne's comment in his November 29, 2006, letter to Richard Martin that "Plaintiffs
would like to explore some type of settlement arrangement." During the crucial four
month period discussed above, Clayborne not only refused to communicate with
Plaintiffs' attorneys, he failed to communicate with his own clients.

## IV.    Personal Injury Action – Middle Stages

40.     By letter of April 12, 2006, Clayborne's partner, Gregory Strommen,
appeared on the file and informed Koehn that he was in the process of attempting to
schedule an IME.

41.     On April 27, 2006, Robin Zephier (Zephier) entered his notice of
appearance as co-counsel for Beckett.

42.     On June 2, 2006, an independent medical examination of Beckett was
conducted by Brett Lawlor, M.D. Dr. Lawlor's July 25, 2006, IME report confirmed
causation, permanency, and the need for future medical treatments consisting of cervical
rhizotomy treatments  at the rate of 1-2 times per year for the rest of Beckett's life. Dr.
Lawlor's report also indicated that the treatments and charges incurred to that date for
medical treatments were reasonable and necessary.

43.     On or about June 27, 2006, APRI filed suit against Beckett, seeking
payment of $39,828.66 due and owing in connection with Beckett's rhizotomy
treatments.

44.     On or about August 4, 2006, judgment was entered against Beckett on behalf of Avera Sacred Heart Hospital in connection with its claim for $5,223.92 in unpaid medical expenses stemming from the August 27, 2004, automobile accident.

45.     In early August 2006, Beckett's attorneys noticed the Martins' depositions for September 5, 2006. Despite repeated requests, they had yet to be given a copy of Dr. Lawlor's IME report.

46.     By letter of August 29, 2006, Strommen followed up on a telephone conversation from the previous day in which he had sought a continuance of the Martins' depositions, writing that "I think it is quite clear that the Martins were not in South Dakota on business and the RAM policy would not be implicated, however, you said you wanted to pursue that. I would like an opportunity to discuss settlement more fully before proceeding with Martins' depositions."

47.     The parties agreed to continue the depositions of the Martins. However, in the course of a September 8, 2006, conference, Strommen made no offer of settlement, claiming instead that he believed he had a strong argument on liability.

48.     State Farm's subsequent presentation of this frivolous liability defense, which was not raised until after Beckett withdrew her offer of a policy limits settlement, constitutes another breach of duty to its insureds.

49.     Becket was forced to hire an expert accident/reconstructionist as a result of State Farm's frivolous liability defense.

50.     On October 11, 2006, Strommen filed an offer of judgment for an amount equal to the State Farm policy limits of $100,000, which offer was not accepted.

51. By letter of November 29, 2006, Koehn informed Strommen of the status of various medical creditor actions against Beckett.

52. In the course of the Martins' December 4, 2006, depositions, the existence of the additional automobile insurance policies that Beckett and her attorneys had been seeking for more than a year was finally confirmed, with Gail Martin testifying that the additional policies had been issued by State Farm and that "[w]e had the truck insurance, we had my car insurance policy, and I believe we had a policy for our daughter's car." This testimony contradicts the discovery responses Clayborne served on November 17, 2005.

53. Although Gail Martin indicated during her deposition testimony that she would forward the insurance policies to Strommen, he refused to turn the policies over, arguing in an April 30, 2007, hearing on Beckett's motion to compel that the insurance policies were not relevant to Beckett's claim. Again, Strommen never explained to the Martins the potential benefits to them of disclosure and production of possibly applicable insurance policies, nor did he ever disclose to the Martins the potential benefits to State Farm of his ongoing refusal to produce the Martins' other State Farm automobile insurance policies.

54. In May 2007, Beckett's medical treatment privileges with pain management specialist, Dr. Frost, with whom she had resumed treating following the termination of her treatment privileges with Dr. Cohen, were terminated.

## V.    **Personal Injury Action Continues**

55. By letter of June 12, 2007, (State Farm adjuster) Truax forwarded to Strommen "two policies that our insured had in force on the above-mentioned date of

loss." Presumably, these are the additional policies referenced by Gail Martin in her deposition testimony.

56.     By letter of June 18, 2007, Strommen forwarded to Zephier only one of the two policies delivered to him by Truax.

57.     By letter of June 29, 2007, Koehn asked Strommen to forward the other State Farm liability policy referenced in Truax's June 12, 2007, letter. Strommen made no response to Koehn's request; and Beckett and her attorneys were never able to obtain a copy of the third policy (if one existed) prior to trial of the personal injury action, making it impossible for them to accurately evaluate the available insurance coverage.

58.     By letter of July 9, 2007, Strommen informed Truax that he planned to retain a private investigator: "I will retain Kolbach investigations to get that accomplished. He is the same investigator we used successfully in the Holzwarth case."

59.     On August 20, 2007, in a letter to Truax on which the Martins were copied, Strommen wrote as follows:

> [T]he past medical expenses for the rhizotomies procedure totaling approximately $40,000 is in evidence and has been approved by our own independent medical examination doctor, Brett Lawlor, M.D. In addition to the $40,000 from APRI, Plaintiff will have additional medical specials totaling close to $20,000. *Thus, we are by no means out of the woods in terms of our policy limits if we receive an unfavorable plaintiff's verdict,* however, the big exposure in this case is future medicals, and I believe that has been greatly reduced.

(Emphasis added)

60.     In fact, the situation with regard to State Farm's policy limits was worse than Strommen was apparently willing to admit in a letter that would one day be available to his clients, who were facing an excess verdict as a consequence of State Farm's abusive practices. At that point, Beckett's past medical expenses actually totaled

approximately $130,000, a fact Strommen had been informed of repeatedly; and, Dr.

Lawlor's report acknowledged Beckett's likely future treatment needs as including

rhizotomies at 1-2 year intervals for the foreseeable future.

      61.    From the early stages of the claim, Beckett's attorneys had kept Clayborne

and Strommen apprised of Beckett's mounting medical expenses:

- "I have been informed that the treatment costs for each rhizotomy is in excess of $7,000. Thus, following the May procedure, Liz's medical expenses will total somewhere in the neighborhood of $30,000, with treatment expected to continue over the course of the foreseeable future." (04/26/05 letter from Koehn to State Farm.)
- "Through June 27, 2005, Liz's medical expenses totaled $68,961.09." (07/22/05 letter from Koehn to Clayborne.)
- "As Liz's records indicate, rhizotomy treatments run somewhere between $25,000 and $50,000 per treatment sequence, and the average rhizotomy patient requires treatments every six months to 2 years. The only policy of insurance so far disclosed will cover only a small portion of Liz Beckett's damages. In fact, a single additional treatment sequence could push her past medical expenses alone close to the limits (plus PIP benefits) of the State Farm policy." (08/15/05 letter from Koehn to Clayborne.)
- "As is referenced in my clients' discovery responses, Liz Beckett will be undergoing further rhizotomy treatments in early October. These treatments, like those that went before, will be costly; and it is beginning to look as if they may well need to be repeated every six months to a year. . . . Obviously, the greater Liz Beckett's medical expenses become relative to the available coverage the less likely it becomes that she will be willing to accept even a policy limits settlement offer. I am, accordingly, hoping to receive your client's complete document production in the near future. I also hope that we can set deposition dates for my clients, my clients' medical care providers, and any other witnesses you wish to depose in the very near future as well." (09/30/05 letter from Koehn to Clayborne.)
- "As I have indicated in previous letters, my clients worry that the litigation of their claim may well go on so long that the entirety of any recovery will be consumed by subrogation claims. With more than $110,000 in medical expenses to date, and additional rhizotomies (at $40,000 per procedure) likely to be needed every six months for the foreseeable future, we may already be at that point. . . . I am obviously of the opinion that State Farm should

have offered its policy limits long ago." (11/26/05 letter from Koehn to Clayborne.)

- "For months now, it has been evident that Liz's damages exceed (by many times) $100,000. What has only recently become clear is that $100,000 in coverage is apparently all there is. Already every nickel of that $100,000 is owed to Liz's health care providers and health insurance company. We are closing in on exactly the situation I have repeatedly warned against – a scenario where even a policy limits recovery leaves Liz with medical bills owing and the likelihood of being cut off from further medical treatment of the injuries she suffered in the accident with your client." (12/08/05 e-mail from Koehn to Clayborne.)

- "Nor, in light of your client's exposure to the possibility of a devastating excess judgment, has there been any reasonable or good faith basis for a failure to tender from the point in July when you received my client's settlement binder, documenting approximately $68,000 in medical expenses to date and ongoing debilitating headaches clearly linked to the accident with your client. Subsequent to the October rhizotomy treatments, which pushed Liz's medical expenses to date over $110,000, State Farm's failure to tender policy limits becomes even more arbitrary. . . . As you know, Ms. Beckett's past medical expenses are already well in excess of $100,000. Her ability to obtain the future medical treatments she requires has been placed in jeopardy by State Farm's refusal to date to accept our settlement offer." (01/17/06 letter from Koehn to Clayborne.)

- "I have also enclosed a copy of the most recent subrogation report from DakotaCare. It documents approximately $7,500 in new billings over the first eight months of this year. (Note: the report's $103,265.20 in total billings does not include any pre-12/1/04 treatment costs, when Liz was approved for coverage by DakotaCare.)" (11/29/06 letter from Koehn to Strommen.)

62.    Strommen's misrepresentation in stating Beckett's past medical expenses to be $60,000 when he was on repeated notice that her past medical expenses were more than $100,000 was made in an effort to mislead the Martins as to the extent of the Martins' exposure to an excess verdict.

## VI.    Personal Injury Action: Pretrial

63.    At some point in November or December 2007, Strommen having lost his motion to exclude the testimony of Plaintiff's expert accident reconstructionist, State

19

Farm retained a frequent State Farm expert accident reconstructionist, Lewis Dirks, to testify on behalf of Richard Martin, despite Strommen's having informed Truax in a July 9, 2007, letter that "I do not anticipate retaining our own accident reconstruction expert because there is not sufficient evidence upon which he could base a legitimate accident reconstruction that would include closing speeds, point of impact, and speed of the vehicles."

64.     By letter of March 5, 2008, addressed to RAM Mutual attorney, Kirby Dahl, Koehn again placed RAM Mutual on notice of State Farm's bad faith; in that same letter, Koehn also again expressed his opinion that Richard Martin was entitled to appointment of independent counsel. Strommen was copied on that letter.

65.     By letter of March 6, 2008, addressed to Zephier and Koehn, Strommen responded to Koehn's March 5, 2008, letter, disputing Koehn's assertions. Strommen's letter attached an Offer of Judgment for $100,000.

66.     By letter of March 12, 2008, Koehn rejected the Offer of Judgment.

## VII.   Personal Injury Action: Trial & Post-trial

### A.     Strommen's and State Farm's Concealment of Accident Photographs/Frivolous Liability Defense

67.     Following the August 27, 2004, accident, Beckett's vehicle had been towed from the scene. State Farm's property adjusters determined the vehicle was a total loss. Consequently, neither Beckett nor her attorneys had post-accident photographs of the vehicle in their possession. Throughout the course of the discovery process, Beckett and her attorneys had requested that the State Farm property adjuster photographs be produced. Strommen repeatedly denied he had any such photographs in his possession or that State Farm had any such photographs in its possession.

68.     At trial of the personal injury action, Strommen produced the photographs, admitting that they had been in his possession throughout, but claiming that he had not been able to find them until just then. The photographs were only produced after one of the officers on the scene of the August 27, 2004, accident, retired South Dakota Highway Patrol officer, Mike Thorson, provided the parties with copies of a video he had found in his attic, which video and Thorson's testimony were inconsistent with the defense position, adopted following Beckett's attorneys' September 8, 2006, reiteration of Beckett's unwillingness to accept even a State Farm policy limits offer of settlement, that the accident was a low impact, rear-end collision, in which liability was a genuine issue.

69.     The photographs produced at trial were also inconsistent with the defense position, establishing that defense counsel and State Farm were aware throughout of the frivolous nature of the 'strong' liability defense Strommen first claimed to have on September 8, 2006.

70.     According to South Dakota law, negligence is established when a driver admits violating the law that prohibits following too closely. See, *Baddou v. Hall*, 756 N.W.2d 554, 2008 WL 4260985 (S.D.), 2008 SD 90. Nevertheless, throughout the course of litigation of the personal injury action, up to and including trial, State Farm continued to contest liability, despite the fact that the August 27, 2004, accident was a rear-end collision for which Richard Martin was cited at the scene for following too closely, to which citation Richard Martin pleaded guilty.

71.     In the course of his testimony at trial, Richard Martin effectively conceded liability. Defense counsel did not call its accident reconstructionist to testify at trial.

**B.**     **Strommen's  and State Farm's Personal Attacks and Intentional Misrepresentations**

72.     During the course of a September 21, 2007, hearing in the personal injury action, Strommen had misled the court, when, in response to a motion by Beckett's attorneys to preclude him from referring to Beckett's attorneys and expert witnesses as 'members of a team' who are 'playing the lottery', he indicated that he had never used such terms before, and that if Beckett's attorneys were contending otherwise, then "You should have provided the transcript."

73.     At trial of the personal injury action, in his closing, Strommen made personal attacks on the integrity of Beckett's expert witnesses of precisely the sort Beckett's attorneys had attempted to preclude.

74.     At trial, Strommen also made several suggestions to the jury that he knew to be false or inappropriate, including suggesting that Beckett had stopped receiving rhizotomies because they were either ineffective or she no longer needed them.

75.     At trial, the trial court made two significant rulings that were in error: (1) allowing the defense to contest liability, despite Richard Martin's having been cited for, and pleading guilty to the charge of, following too closely; and (2) allowing the jury to hear testimony regarding Beckett's health insurance.

76.     Nevertheless, the jury in the personal injury action returned a verdict for $150,000 in favor of Beckett.

77.     Strommen's actions in contesting liability without any facts to support such a defense, refusing to turn over post-accident photographs, and attacking the integrity of opposing counsel and opposing expert witnesses are consistent with the 'mad

dog' or 'hardball' litigation tactics for which State Farm has become notorious over the past two decades, which tactics are discussed further below.

78.     Strommen's handling of each of these matters was pursuant to those State Farm litigation tactics.

79.     Strommen's contesting of liability on a straight-forward rear-end collision case is an instance of another institutionalized State Farm litigation tactic, pursuant to which State Farm instructs the attorneys appointed to defend its insureds to contest liability, even where such tactics are not in the interests of the State Farm insured, and even where such tactics expose the State Farm insured to the danger of an excess judgment.

80.     According to jurors, the jury's verdict would have been significantly higher were it not for Strommen's wrongful actions and the trial court's errors.

81.     During the course of Clayborne's and Strommen's representation of Richard Martin, it was Clayborne's and Strommen's routine practice to not inform the Martins of settlement offers and to not inform the Martins that they had failed to disclose evidence or possibly applicable insurance policies to Beckett and her attorneys. It was Clayborne's and Strommen's routine practice to not inform the Martins that the purpose of many of the activities and omissions engaged in by Clayborne and Strommen, ostensibly on behalf of the Martins, was in fact to protect State Farm's interests. As a result, the Martins were unable to take steps to protect their own financial interests.

82.     Following a November 10, 2008, hearing, the personal injury action court, with which State Farm had deposited its policy limits, plus court-ordered costs, and interest, ordered more than $65,000 of those funds released to APRI in partial satisfaction

23

of judgment of the June 27, 2006, collection suit, in which APRI had originally sought less than $40,000.

83.     Strommen, in documents filed with the personal injury court in anticipation of the November 10, 2008, hearing, argued that by assigning any portion of their causes of action against State Farm to Beckett the Martins were no longer liable for any excess judgment in the personal injury action. This argument is directly contrary to South Dakota law, as set forth in *Kobbeman v. Oleson*, 1998 SD 20, 574 N.W.2d 633.

84.     This argument was made not on behalf of the Martins, but on behalf of State Farm.

85.     In an ongoing bad faith insurance case in the United State District Court for the District of Colorado (*Yoon Boon Lee v. State Farm Mutual Automobile Insurance Company*, Case 1:02-cv-01153-JLK), State Farm raised the argument, as a defense to Yoon Boon Lee's claims of bad faith, that its insured's entering into a similar assignment as that entered into by the Martins constituted a violation of the State Farm policy's cooperation clause.

86.     With their post personal injury action trial filings, in which they frivolously claim that by virtue of their assignment of causes of action to Beckett the Martins no longer owe any excess judgment, State Farm and Strommen have taken the first step in setting up this frivolous defense for use in this action.

## VIII.  State Farm's Duties and Breaches of Duty

87.     South Dakota law recognizes an implied covenant of good faith and fair dealing inherent in every insurance contract, pursuant to which an insured's interests must be given at least equal consideration with those of the insurer.

88.     An insurer has committed bad faith when, with knowledge or reckless disregard, it denies policy benefits to an insured without a reasonable basis for denial. An insurer may be found to have acted in bad faith when it unreasonably subjects its insured to the rigors and uncertainty of trial, when it fails to settle a claim without litigation, and when it fails to fairly and adequately investigate a claim.

89.     State Farm's duties include but are not limited to: (i) a duty to act in good faith in all aspects of the business relationships it has with its policy holders, among which are Richard and Gail Martin, including, more specifically, a duty to act in good faith in its claims handling activities; (ii) a duty to thoroughly, fairly, and promptly investigate and evaluate claims against its insureds; (iii) a duty to give equal regard to the financial and emotional welfare of its policy holders as it does to its own interests when determining whether to settle third-party claims; (iv) a duty to fairly evaluate claims against its policy holders; (v) a duty to disclose to its policy holders any financial conflicts of interest that exist between insurer and policy holder; (vi) a duty to disclose to its policy holders if it considers the attorneys it appoints to represent such policy holders to be agents of the insurer; (vii) a duty to promptly communicate settlement offers to its insureds; (viii) a duty to evaluate offers of settlement from the perspective of the interests of its insureds and to accept reasonable offers of settlement; and (ix) where the insurer has committed bad faith, to mitigate the damages the insured has or will suffer as a result of that bad faith.

90.     State Farm has breached its duties on a repeated and continuing basis, instances of which include but are not limited to: (i) its attempts to conceal its policies written on the Martins' other vehicles; (ii) its refusal to enter into a policy limits

settlement of Beckett's claim against its insured, Richard Martin, despite the likelihood of an excess judgment against Richard Martin; (iii) its delay in tendering its policy limits on behalf of Richard Martin, which delay was intended to allow it to profit during the time interval between the time when State Farm knew or reasonably should have known that Beckett's injuries and damages equaled or exceeded Richard Martin's policy limits and the time when State Farm tendered Richard Martin's policy limits; (iv) its failure to communicate settlement offers to Richard and Gail Martin; (v) its refusal to take financial responsibility for the excess verdict entered against Richard Martin in the personal injury action; (vi) its failure to inform the Martins that it considered Clayborne and Strommen to be agents of State Farm; (vii) its failure to investigate facts relating to liability and damages; and (viii) its failure to take any steps to mitigate the damages caused to its insureds, Richard and Gail Martin, as a result of its bad faith.

91.     State Farm has also breached additional duties through actions and omissions undertaken by its agents, Claybornes and Strommen, which breaches of duty include but are not limited to: (i) failing to investigate possibly applicable policies for the benefit of its insureds and failing to investigate the facts on which coverage under such policies might exist; (ii) failing to place the interests of its insureds ahead of the interests of the insurer; (iii) failing to accurately disclose to its insureds on a timely basis any settlement offers made; and (iv) failing, where necessary, to retaining independent and qualified experts to assist in the fair, reasonable, objective and prompt investigation of claims.

92.     Through their actions and omissions, Clayborne and Stromme, acting as State Farm's agents, breached those duties on a repeated and continuing basis, instances

of which include (i) acting to conceal State Farm policies on the Martins' other vehicles, thereby potentially depriving the Martins of coverage under those policies; (ii) failing to inform Richard Martin that they consider themselves to be agents of State Farm and that they placed State Farm's interests ahead of those of the Martins; (iii) failing to accurately disclose to the Martins the settlement offers made by Beckett; (iv) retaining long-time State Farm 'expert' accident reconstructionist, Lewis Dirks, whose unsupported opinions and testimony were used to induce Richard Martin to believe that it was reasonable for Clayborne and Strommen to reject Beckett's offers of settlement; (v) concealing evidence (e.g., post-accident photographs of Beckett's vehicle) tending to disprove their arguments on liability and causation; and (vi) failing to investigate the possibility of other possibly applicable policies, the facts underlying coverage issues, and the facts relating to liability and damages.

93.     State Farm's bad faith activities have been ongoing, with the company breaching its duty to the Martins by refusing to take any steps to mitigate the damages caused by its bad faith failure to settle, despite the fact that it has had ample opportunity to do so, having been repeatedly placed on notice of its duties and breaches of duty over a period of many months.

## IX.    Institutionalized Wrongdoing: State Farm

### A.    The ACE Program and Other Similar State Farm Programs

94.     State Farm is the largest insurance underwriter for consumers in the United States and has been the single largest automobile insurer for consumers in the United States for more than 50 years.

95.     In its advertising and nationally distributed literature (e.g., its Auto Claim Manual and Commitment to Policyholders), State Farm promises that "like a good neighbor" State Farm will be "there" when its policyholders (insureds) need State Farm's insurance services.

96.     For more than 20 years, State Farm has pursued national litigation patterns and practices that are built on the practice of 'mad dog' or 'hardball' defense litigation tactics, whereby State Farm, particularly on small- and medium- sized claims, complicates litigation and settlement negotiations with frivolous defenses and needless delays.

97.     Through the use of such tactics, State Farm exploits its power as an insurer, in violation of its legal duties to its insureds and other claimants and/or consumers of its insurance products, and to the legal detriment of its insureds and other claimants and/or consumers of its insurance products.

98.     The above-referenced tactics engaged in by State Farm appointed attorneys, Clayborne and Strommen, are part of those national patterns and practices.

99.     Such tactics are endorsed, and perhaps required, by State Farm not for the benefit of its insureds but for the benefit of State Farm, in the belief that use of such tactics allows the company to (i) intimidate claimants from filing claims against its insureds, (ii) reduce its payouts on claims that are filed, and (iii) profit from the delay between injury and payout in those cases where it is ultimately forced to pay out its policy limits.

100.    Where such tactics fail and a claimant obtains a verdict in excess of State Farm's policy limits, it is also a part of State Farm's national patterns and practices to

deny responsibility for such excess verdict, leaving its insured to suffer the financial consequences of State Farm's gamesmanship.

101.    Such national patterns and practices, applied to both first-party and third-party claims, are designed to discourage policyholders and other claimants from pursuing legitimate claims for financial benefits from State Farm, resulting in State Farm's having reaped billions of dollars of illegal profits as a consequence of the implementation of such policies and practices.

102.    State Farm also has a long-established practice of delay in investigating and evaluating claims against its insureds, which practice is intended to allow State Farm to profit financially because of corresponding and consequential delays in judgments or settlements.

103.    In recent years, through its Advancing Claims Excellence (ACE) program, as well as the ACE program's predecessor and successor programs (other similar State Farm programs), State Farm has effected a nationwide redesign of its claims-handling, pursuant to which claims management and personnel are evaluated on minimizing claim costs and indemnity payouts, and maximizing corporate profits through various financial incentives designed to reward claims personnel for "lowballing" and delaying claims payments.

104.    State Farm's ACE program had two components. The first was a diagnostic file review, undertaken in the late 1990s on a nationwide basis. The second component was the implementation of a new way of handling claims, ostensibly based on the results of the diagnostic file review.

105.    On information and belief, State Farm continues to operate under the ACE and/or TEACH system and/or one or more of its successor programs to this day.

106.    The purpose of the ACE and/or TEACH program and other similar State Farm programs is to reduce State Farm payments on claims brought under its policies.

107.    It is a permanent change in the State Farm claims-handling culture, focusing on changes in the way claims are investigated and payments negotiated, which changes are implemented through the adoption of various programs and initiatives aimed at changing State Farm claims-handling personnels' claims-handling techniques, and backed up by performance reviews for such claims-handling personnel.

108.    Following such performance reviews, claims-handling personnel who show the greatest reductions in payouts are rewarded with wage increases, bonuses, and promotions.

109.    Those claims-handling personnel whose payout reductions are deemed inadequate are either not so rewarded or suffer wage and/or bonus cuts, or termination of their jobs.

110.    Among the practices taught and institutionalized pursuant to the ACE and/or TEACH program and other similar State Farm programs are lowering the range of values assigned to a claim, reducing claimant/attorney expectations through silence and delay prior to making an initial offer, and making first offers at the bottom of or significantly below the range of values assigned to the claim.

111.    The principles explicitly underlying the practices taught and institutionalized pursuant to the ACE and/or TEACH program and other similar State Farm programs are that insurance companies have an aura of legitimacy, that control of

the money is power, that such power should be used, *that when power is lacking the claims-handler should delay*, that negotiations should be intentionally slowed down and settlements should be delayed.

(The allegations contained in this paragraph and the preceding paragraphs relating to the ACE program are based on documents in the hands of Plaintiffs' attorneys subject to a December 8, 2004, order issued in the matter of *Yoon Boon Lee v. State Farm Mutual Automobile Insurance Company*, United States District Court for the District of Colorado, Civil Action No. 02-K-1153, by the Senior District Judge for the United States District Court, District of Colorado, which order is attached to this complaint as Exhibit 1. Such order provides that the documents and information in question "may be used in other litigation in which State Farm is involved as a party or as an insurer subject to whatever limitations the particular court may impose in the litigation pending before it." However, until this Court has had the opportunity to determine appropriate limitations on the documents and information contained in them, the documents themselves will not be disclosed by Plaintiffs, nor will passages from the documents be directly quoted.)

112.    State Farm's attempted practice and intent regarding the ACE program and other similar State Farm programs is to destroy the documents used to implement the program after the program has been successfully implemented and a culture of bad faith instilled, in an effort to conceal both the existence and the purpose of such programs, thereby making proof of bad faith more difficult.

113.    The ACE and/or TEACH program and other similar State Farm programs used by State Farm result in bad faith claims handling in a variety of ways, one of which

is by locking the adjuster into the lowest in a range of claim values early in the claim process and not allowing departures from that value without additional facts.

114.    The end result of the various techniques implemented through the ACE program and other similar State Farm programs is to intentionally under-value settlements paid out by State Farm on claims brought against State Farm policies, whether such claims are brought by third-party claimants or by State Farm insureds.

115.    The national patterns and practices furthered by State Farm's ACE program and other similar State Farm programs have been in place for a number of years and are, to Plaintiffs' best knowledge and belief, ongoing through the present date, which contention is supported by the following passage taken from a February 13, 2009, order issued by the Florida Office of Insurance Regulation in an action titled *In the Matter of State Farm Florida Insurance Company*:

> State Farm's cited reasons in the Withdrawal Plan are both disingenuous and misleading to the Office and policyholders they seek to abandon. State Farm created its current "crisis" by failing to pursue the opportunities that were available to reduce its expenses and mitigate its decrease in premium volume. Instead, it chose to attempt to raise rates in order to reduce the savings to its policyholders its mitigation discounts provided and to seek a profit that was excessive and unreasonable in the current economic conditions while certifying that its rate filing reflected all premium savings that resulted from legislative enactments. *State Farm's actions raise serious questions regarding the fitness and trustworthiness of its officers and directors to engage in the business of insurance.* (Emphasis added)

116.    In 1997, former State Farm claims supervisor, Jim Aaberg, stated that State Farm pushes its employees to reduce the average amount of money paid per claim: "Nobody comes out and says, 'We will lowball a claim', but the system is set up such that you were rewarded for lowballing a claim and uh . . . punished for not." (Transcript of KGO-TV – KGO-Radio Investigation of State Farm, aired 11/04/97.)

117.   According to former State Farm employee, Bill Dias, State Farm employees are ordered to lie under oath when testifying in lawsuits brought against the company.

118.   Former State Farm employee, Amy Zuniga, prepared company witnesses to testify in such suits as part of her job at State Farm. In a sworn declaration filed in California state court, Zuniga stated that it is State Farm policy to train its employees "not to answer a question with yes or no" so as to allow "wiggle room to change the answer at a later time." (Transcript of KGO-TV – KGO-Radio Investigation of State Farm, aired 11/05/97.)

119.   Dias also stated that he was ordered to destroy documents and lie about the existence of other documents in order to keep them out of the hands of bad faith plaintiffs and their attorneys. (Transcript of KGO-TV – KGO-Radio Investigation of State Farm, aired 11/06/97.)

120.   When confronted with the allegations in the KGO reports, State Farm CEO, Ed Rust (Rust), issued a videotaped statement to KGO denying that State Farm engages in institutionalized wrongdoing in its claims-handling operation, stating that "If anyone has ever believed that Claims has a mission to create profit at the expense of proper claim handling and that impression hasn't been corrected, it is now." (Transcript of KGO-TV – KGO-Radio Investigation of State Farm, aired 11/04/97.)

121.   Yet, even as Rust was denying the allegations of the KGO report, State Farm was continuing its roll-out of the ACE program and, in fact, had scheduled implementation of the program in California, where KGO is located, for the very month the KGO reports on State Farm aired.

122.    State Farm continues to make use of the ACE program and other similar State Farm programs to treat its claims-handling operation as a profit center.

123.    The incentives and disincentives incorporated into these programs are designed to, and effectively do, ensure that its claims adjusters wrongfully deny benefits, depriving policyholders, non-policyholder claimants, and the insurance consuming public of the insurance products to which they are legally entitled.

124.    Such programs prevent claims adjusters from handling each claim on its merits by using a system of incentives and disincentives to ensure systematic and systemic underpayment of claims.

125.    The falsification or withholding of evidence in claims files is also not an occasional act, isolated to this claim, but is a general and predictable consequence of programs such as ACE and other similar State Farm programs, engaged in systematically and systemically.

126.    State Farm's efforts to conceal the fact that it treats its claims-handling operation as a profit center include employees at every level, from CEO Ed Rust to the adjuster on any given claim.

127.    Those efforts are not limited to lying to the media or even lying under oath about the company's activities, but also include targeting what it believes to be those consumers least likely to be knowledgeable about their rights; systematically destroying or concealing documents, both prior to and in the course of litigation against the company; coaching its employees to give dishonest testimony; and, intimidating opposing claimants, witnesses, and attorneys.

128.    Such efforts to conceal the fact that it treats its claims handling operation as a profit center are not occasional, but rather are systematic and systemic.

129.    The ACE program is only one of many similar programs State Farm has implemented over the years. Over the last thirty (30) to thirty-five (35) years, both before and after the implementation of the ACE program, State Farm has implemented a series of programs similar to ACE.

130.    As part of its patterns and practices of concealment, State Farm routinely changes the names of such programs and attempts to destroy all records and documents relating to such programs in order to more effectively conceal its ongoing illegal activities.  (i.e. ACE, TEACH)

131.    The underlying purpose of the ACE program and other similar State Farm programs is to enhance profits in its claims-handling operation, which purpose is illegal.

132.    While an insurer is legally entitled to profit from its premiums and its investments on those premiums, it is illegal to attempt to create profits in its claims-handling operation by seeking to reduce the number of claims, lower payouts, or profit from unreasonable delays between injury and payout.

133.    State Farm's actions and omissions in handling Beckett's claim against its insured, Richard Martin, conformed to, and were engaged in pursuant to, State Farm's national patterns and practices.

134.    In South Dakota, the parties who have been, or who are being, injured by State Farm's national claims-handling patterns and practices are Beckett, the Martins, others making claims against State Farm policies, other policy-holders who do not know

their policies are not what were advertised, and other insurance companies trying to compete honestly in the marketplace.

**B.**     **State Farm's 'ACE-Equivalent' Claims Handling Program for Attorneys Appointed by State Farm to Defend State Farm Insureds.**

135.    On information and belief, since 1972, State Farm has had in effect a practice or program by which State Farm appointed counsel defending State Farm insureds are considered by State Farm to be agents of State Farm for purposes of that litigation.

136.    State Farm continues to consider the defense counsel it appoints to represent its insureds to be agents of State Farm.

137.    State Farm does not disclose to its insureds the fact that it considers such defense counsel to be its agents, and it did not disclose this fact to Richard Martin; nor did either Clayborne or Strommen inform the Martins that State Farm considered them to be agents of State Farm or that they (Clayborne and Strommen) considered themselves to be agents of State Farm.

138.    Since 1994, through its Legal Services Program, a manual for all counsel representing State Farm or its insureds, State Farm has required that such counsel obtain State Farm claim management approval before any motions can be filed in any case involving State Farm or its insureds.

139.    On information and belief, State Farm had and continues to have an 'ACE-equivalent' claims-handling program that it disseminates, in either written or oral form, to the defense attorneys it appoints to defend its insureds, which program is similar to the ACE program and other similar State Farm programs.

36

140.    On information and belief, the refusal of State Farm appointed attorneys, Clayborne and Strommen, who were operating as the legal agents of State Farm, to communicate with Koehn during the crucial four (4) month period when Beckett's State Farm personal injury settlement offer was on the table and Koehn was warning of Beckett's imminent loss of treatment privileges was done pursuant to State Farm's ACE program, 'ACE-equivalent' program, or (an)other similar State Farm program(s) designed to illegally increase State Farm's claims handling profits.

141.    The refusal of State Farm's attorney-agents to communicate, to produce other State Farm policies, to negotiate in good faith, to inform Richard Martin of settlement offers, and to step aside for independent counsel (or even advise Richard Martin of his possible need for independent counsel), all constitute breaches of State Farm's duty to its insured, Richard Martin.

142.    These breaches were ongoing and continued for a period of months and, in some cases, years; and, were engaged in pursuant to and in furtherance of State Farm's implicit instructions and/or expectations as to how State Farm claims should be handled.

143.    On information and belief, each and every one of the above-referenced litigation tactics and practices employed by State Farm's attorney-agents, Clayborne and Strommen, is taught by State Farm to the attorneys it appoints to represent its insureds.

144.    The actions and omissions undertaken by State Farm's attorney-agents, Clayborne and Strommen, in their handling of Beckett's personal injury claim against Richard Martin conform to the ACE script; and, on information and belief, were undertaken pursuant to the ACE program or the defense attorney 'ACE-equivalent' program implemented by State Farm for use by State Farm appointed defense attorneys.

## X.        Principal-Agent Relationships

145.    Pursuant to Gilchrist v. Trail King Industries, Inc., 655 N.W.2d 98 (S.D.

2002) ([a] principal is presumed to know what its agent knows and is accountable for the

actions and inactions of its agents), State Farm is liable for the actions of Clayborne and

Strommen, who at all times relevant to the allegations set forth herein were operating as

the agents of State Farm.

## IX.      State Farm's Wrongdoing: Intent

146.    Each of the actions complained of in this complaint, whether such

behavior was an act of commission or omission, was engaged in intentionally; recklessly;

with actual or constructive malice; or with conscious, willful and wanton and/or reckless

disregard for the rights of the Martins, Beckett, and/or the classes of consumers of

insurance or legal products discussed above and below, with knowledge or constructive

knowledge of the fact that such actions would cause financial and emotional injury.

## XII.    Damages

147.    As a result of State Farm's and its agents' illegal actions and omissions,

Beckett and the Martins have suffered economic and non-economic injuries, specifically

including emotional distress, and are, as a consequence of such illegal actions and

omissions entitled to compensatory and punitive damages in amounts to be proven at

trial, but in excess of the jurisdictional minimal. Both Beckett and the Martins have

suffered physical illness and other physical manifestations of the physical, mental, and

emotional stress and distress as a consequence of State Farm's acts and omissions.

## XIII.   Spoliation of Evidence

148.    State Farm has adopted a document destruction policy designed to prevent access by litigants to State Farm claims-handling manuals or guides, and any other documents that would assist litigants in establishing to a court or jury State Farm's illegal patterns and practices. State Farm should be enjoined from destroying any documents relevant to the handling of the Beckett/Martin claim; and, pursuant to South Dakota law, it should be presumed that any documents not available to Plaintiffs because of State Farm's failure to preserve such documents would have provided evidence supportive of Beckett's and the Martins' claims.

## CAUSES OF ACTION

### Count 1
### Common Law Bad Faith

149.    Paragraphs 1 - 148 are hereby incorporated as if fully set forth herein.

150.    State Farm and its agents had no reasonable basis for the various actions and omissions committed by them in handling Beckett's claim against Richard Martin, which actions were in violation of its duties to its insured; and, State Farm and its representatives and agents were aware or reasonably should have been aware of the lack of any such reasonable basis.

151.    State Farm and its agents breached its various duties repeatedly and with the requisite intent, thereby causing the injuries and damages set forth herein, and entitling the Martins and their assignee, Beckett, to an award of compensatory damages, both economic and non-economic (specifically including damages for mental and emotional distress), as well as punitive damages, in amounts to be established at trial.

### Count 2
### Abuse of Process

152.    Paragraphs 1 - 151 are hereby incorporated as if fully set forth herein.

153.    As is set forth above, State Farm's abuse of process in the underlying personal injury action was willful, committed through a variety of acts of both commission and omission not proper to the proceeding, and committed for the ulterior purposes of intimidating Beckett, delaying the pay-out date of State Farm's policy limits, and concealing from the Martins State Farm's numerous breaches of its duties to its insureds.

154.    As a proximate result of State Farm's actions, Beckett and the Martins suffered the injuries and damages set forth herein and are, consequently, entitled to an award of compensatory damages, both economic and non-economic (specifically including damages for mental and emotional distress), as well as punitive damages, in amounts to be established at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek an award of compensatory damages in an amount to be finally determined at trial, along with an award of punitive damages in such amount as to deter State Farm from future conduct of this sort and in an amount commensurate with State Farm's and its agents' actions and omissions in this case, along with an award of costs and expenses and all other relief available under the law.

Dated this _____ day of March, 2011.

_____
Robin L. Zephier
Abourezk & Zephier
P.O. Box 9460

40

Rapid City, SD  57709-9460
(605) 342-0097

Mark A. Koehn
Mark Allen Koehn, P.C.
P.O. Box 9655
Rapid City, SD  57709-9655
(605) 394-4951

Mathew Van Bruggen
Kennedy, Nervig, Carlson & Van Bruggen, LLP
503 Jefferson Street South
P.O. Box 647
Wadena, MN 56482-0647
(218) 631-2505

**A TRIAL BY JURY IS HEREBY DAMANDED**